Zachary Nightingale (California Bar #184501)
Avantika Shastri (California Bar #233453)
Van Der Hout, Brigagliano & Nightingale, LLP
180 Sutter Street, Fifth Floor
San Francisco, California 94104
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Attorneys for Petitioner
Preston MAGIYA

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO

| | |
|---|---|
| Preston MAGIYA | Case No. C 07-2945 CRB |
| Petitioner, | **Declaration of Zachary Nightingale in Opposition to Respondent's Motion for Summary Judgment** |
| v. | |
| Michael B. MUKASEY | |
| Respondent. | |

<u>DECLARATION OF ZACHARY NIGHTINGALE</u>

I, Zachary Nightingale, do hereby declare and state:

1.  I am a licensed attorney admitted to practice in the State of California, and before the United States Court of Appeals for the Ninth Circuit. I am a partner with the law firm of Van Der Hout, Brigagliano & Nightingale LLP, 180 Sutter Street, 5th Floor, San Francisco, California, 94104.   I am attorney of record for Petitioner in his appeal before the Ninth Circuit Court of Appeals, and in the proceedings before this Court.  I have personal knowledge of the following facts and could testify regarding these facts if called to do so.  These documents below were either provided to our office by Petitioner, produced by the former Immigration and Naturalization Service ("INS") in the course of Petitioner's prior proceedings before the Immigration Court and submitted into those proceedings, or produced in these proceedings.

2.  Attached as Exhibit A is a copy of a declaration by Petitioner, Preston Magiya, regarding the circumstances of his birth and upbringing in the United States, dated April 16, 2008.

3.  Attached as Exhibit B is a true and correct copy of a delayed Registration of Birth for Petitioner, filed June 23, 1986.

4.  Attached as Exhibit C is a true and correct copy of a delayed Registration of Birth for Petitioner, issued July 13, 1991.

5.  Attached as Exhibit D is a true and correct copy of the Memorandum from DIINV/SFR to Interpol/INS Liaison dated April 22, 1988.

6.  Attached as Exhibit E is a true and correct copy of the Letter from INS Assistant District Director for Investigations to California Department of Social Services dated April 21, 1988.

7.  Attached as Exhibit F is a Memorandum to file, dated April 29, 1988.

8.  Attached as Exhibit G is a Letter from INS Assistant District Director for Investigations to Regional Inspector General for Investigations, Department of Health and Human Services dated April 4, 1988.

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9.   Attached as Exhibit H is a true and correct copy of excerpts from the Deposition of

Debbie Balsley, taken on December 14, 2008, specifically pages 41-46 and pages 53-70.

I declare under penalty of perjury under the laws of the State of California that the foregoing is

true and correct.  Executed this 18th day of April, 2008 at San Francisco, CA.

/s/ Zachary Nightingale
Zachary Nightingale
Declarant

2

EXHIBIT A

### DECLARATION OF PRESTON MAGIYA

I, Preston Magiya, do hereby declare and state:

1. I reside at 132 Greenhedge Lane, Pomona, California, 91766 in a home that I own. I have a wife and United States citizen daughter. I am currently a finance manager for a company in Los Angeles. I make this declaration based on my personal knowledge and belief.

2. I was born at home in Richmond, California on August 28, 1963. My birth was not registered at that time. My understanding is that my parents abandoned me after my birth. I was raised by my paternal grandmother, Bobo Magiya, whom I believed was my mother until I learned the truth from her at the age of 13.

3. I was raised with the understanding of the above basic facts regarding my birth and upbringing. When I was young, my grandmother home-schooled me because she did not believe in a formal education. I was educated at home based on the Bible.

4. Sometime in my early teenage years, I was sent to live with my uncle, Ira Perry, because my grandmother became ill. We lived in Los Angeles and Oakland, California. I did not continue any education while living with my uncle. I would spend my day at odd jobs to support myself.

5. In approximately 1981, I moved out of my uncle's home because he used alcohol and tobacco. Sometime between 1982 and 1984, my grandmother died. I eventually lost contact with my uncle.

6. After I separated from my uncle, I decided that I wanted to attend the College of Alameda in Alameda, California, to improve my employment prospects and obtain an accounting degree. At that time, I found out that I needed identification to register for school. I had never had identification until that point.

7. I first contacted the city of Richmond, California, where I was born, about getting a birth certificate. They did not have any record of my birth because it was never registered. I also tried contacting the State of California, but was not able to obtain any documents to verify my birth or identity with them either.

8. Since I did not have any way to prove my identity, I obtained an identification document on the street in Oakland, California, so that I could use it to register for school. The document was a British passport which I believe was in the name of Preston Hudson. I did not really care that the passport was British because, at that time, I was only interested in obtaining an identity document which would allow me to register for school. I have since obtained a bachelor of science degree from the California State University in Los Angeles, and a MBA from the University of Phoenix.

9. Using the passport, I then obtained my own driver's license and social security card. I wanted to obtain the documents in my own name, Preston Magiya, but could not do it immediately because the government agencies were unwilling to allow for a name different than what appeared in the passport. Thus, I used both names on the social security card application in order to use both my real name and satisfy the agencies. I used the names Preston Ochuko Hudson-Amagiya and Preston Ogheneochuko Amagiya. I obtained a driver's license in the name Preston Amagiya.

10. After I obtained the social security card and the driver's license, I returned the passport to the individual who gave it to me. That person wanted the passport back and I did not need it any more. I never used the passport to travel or for any other reason than to obtain the identity documents.

11. On May 23, 1986, I applied for a delayed Certificate of Birth with the California Department of Health and Human Services. At that time, I was in touch with my uncle, Ira Perry, and a cousin, Laura Kenney. They agreed to act as witnesses on my application. The Certificate was issued on March 21, 1986. I do not have a copy of my application or of the original Certificate that was issued. I was also issued a second delayed Certificate of Birth by California in 1991.

12. On or about February 8, 1988, I was interviewed by an Immigration Officer, Mr. Smirnoff. I told him I was born in Richmond, California. I was put in immigration proceedings shortly afterwards. I believe that the immigration officers were motivated by personal animosity toward me and thus pursued their allegations that I am not a United

2

States citizen, even though I had always told them that I am a U.S. citizen, and I have never seen any evidence they obtained indicating I was born abroad on which to base their alleged opinions otherwise.

13. Since I have been put into immigration proceedings, I have been asked to find witnesses who can testify about my birth and my upbringing in California. I have sought to locate my uncle, my cousin, and other family members and friends from those years. However, I have lost contact with them in the intervening years and have not been able to locate them. The woman who is my biological mother has no role in my life after she abandoned me when I was an infant. I have had virtually no contact with her over the years, met her only briefly, and do not know how to contact her. I do not seek any relationship with her, as I consider my deceased grandmother to be my only mother. I have never known or had any contact with my biological father.

14. On March 16, 2007, the Ninth Circuit heard oral arguments on my case, and on March 29, 2007, they transferred my case to this Court. I would prefer to keep my case before the Federal District Court for the District of Northern California. My immigration proceedings always took place in the San Francisco Immigration Court, and my attorneys, who have represented me for 10 years, are located in San Francisco. It is my understanding that I was born in the district as well, and I spent a good part of my life there. I am willing to travel to San Francisco for any necessary hearings. I believe it would be very difficult for me to find equivalent representation in Southern California given the legal and factual complexity of this case. It would also lead these proceedings to continue even longer than they already have, and after 20 years, I do not wish the proceedings to be further prolonged unnecessarily.

/

/

/

/

3

1  I declare under penalty of perjury under the laws of the State of California that the foregoing is

2  true and correct. Executed this 16 day of April, 2008 in Pomona, California.

3

4  _Preston Magiya_
   Preston Magiya
5  Declarant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B

DELAYED REGISTRATION OF BIRTH

104-63-390821

| | | | |
|---|---|---|---|
| FACTS OF BIRTH | MC PRESTON | CHUCKS | MAGIYA |
| | MALE | 08-28-63 | L. KENNEDY |
| PLACE OF BIRTH | RICHMOND | CONTRA COSTA |
| MOTHER | MARGARTE | SUSAN | HUDSON / MAGIYA |
| | KANSAS | | BLACK |
| | SAM 2 LOTH | WILSON | MAGIYA |
| FATHER | ILL | | BLACK |

CERTIFICATION OF APPLICANT

Theastonhaseys

6-23-86   260 P.M.   Sot #24 OAKLAND   CA 94611

Ira Lee Herst

5-23-86   260 Park #24 OAKLAND Ct 9464

SECOND SUPPORTING AFFIDAVIT

399159

5-23-86

| SUPPORTING DOCUMENTS | Bank Record 10201 D38 463 Crocker National Bank Oakland CA 5-23-86   B-14-80 |
|---|---|
| EVIDENCE | August 28, 1963 | Richmond, California |

NAME OF FATHER

Hudson

STATE OF CALIFORNIA
DEPARTMENT OF HEALTH SERVICES

OFFICE OF
STATE REGISTRAR
OF VITAL STATISTICS

This is to certify that
this is a true copy of
the document filed in
this office, if redacted
on the reverse.

MAR 21 1988

000846

EXHIBIT C



# STATE OF CALIFORNIA

## DEPARTMENT OF HEALTH SERVICES

104- 63-380880

STATE FILE NUMBER

### DELAYED REGISTRATION OF BIRTH
### STATE OF CALIFORNIA

**FACTS OF BIRTH**

| | | |
|---|---|---|
| 3A. NAME OF CHILD—FIRST (GIVEN) **PRESTON** | 3B. MIDDLE **OCHUKO** | 3C. LAST (FAMILY) **MAGIYA** |
| 2. SEX **MALE** | 3. DATE OF BIRTH—MONTH, DAY, YEAR **AUGUST 28, 1963** | 4. NAME OF PHYSICIAN (OR ATTENDANT OR CERTIFIER OR OTHER PERSON ATTENDING THIS BIRTH) **LAWRENCE KERNEY** |
| 5A. PLACE OF BIRTH—HOSPITAL, STREET, NUMBER, LOCATION **CUTTING BLVD. Pt RICHMOND** | 5B. CITY OR TOWN **RICHMOND** | 5C. COUNTY **CONTRA COSTA** / 5D. STATE **CALIFORNIA** |

**FATHER**

| | | |
|---|---|---|
| 6A. NAME OF FATHER—FIRST (GIVEN) **SAMPSON** | 6B. MIDDLE **WILSON** | 6C. LAST (FAMILY) **MAGIYA** |
| 7. BIRTHPLACE (STATE OR FOREIGN COUNTRY) **ILLINOIS** | 8A. RACE / 8B. ETHNICITY **BLACK** | 9. DATE OF BIRTH—MONTH, DAY, YEAR **JUNE 23, 1940** |

**MOTHER**

| | | |
|---|---|---|
| 10A. NAME OF MOTHER—FIRST (GIVEN) **MARGARET** | 10B. MIDDLE **SUSAN** | 10C. LAST (FAMILY) **OMENE/MAGIYA** |
| 11. BIRTHPLACE (STATE OR FOREIGN COUNTRY) **KANSAS** | 12. RACE / 12A. ETHNICITY **BLACK** | 13. DATE OF BIRTH—MONTH, DAY, YEAR **APRIL 15, 1944** |

**CERTIFICATION OF APPLICANT**

I HEREBY CERTIFY UNDER PENALTY OF PERJURY THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT

14. SIGNATURE ▶ *Preston Magiya*

15. I AM THE (CHECK ONE) ☐ PARENT ☐ GUARDIAN ☒ PERSON WHOSE BIRTH IS BEING REGISTERED ☐ ATTENDANT AT BIRTH

18. DATE SIGNED **3/25/91** | 17. ADDRESS OF APPLICANT (STREET, CITY, STATE) **1906 N. Marianna, LOS ANGELES, CALIF.**

18A. DATE OF DEATH | 18B. STATE FILE NUMBER

**FIRST SUPPORTING AFFIDAVIT**

I HEREBY CERTIFY UNDER PENALTY OF PERJURY THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT AND THAT I HAD PERSONAL KNOWLEDGE OF THIS BIRTH AT THE TIME OF OCCURRENCE FOR THE FOLLOWING REASON:
**I HAD PERSONAL KNOWLEDGE OF HIM SINCE BIRTH**

19A. SIGNATURE OF PERSON COMPLETING THE AFFIDAVIT ▶ *M Omene* | 19B. RELATIONSHIP TO PERSON WHOSE NAME IS ENTERED IN ITEM 1 **UNCLE** | 19C. AGE OF PERSON COMPLETING THE AFFIDAVIT **34**

19D. DATE SIGNED **3/21/91** | 19E. ADDRESS OF PERSON COMPLETING THE AFFIDAVIT (STREET, CITY, STATE, ZIP) **1618 11th Street, OAKLAND, CALIFORNIA 94607**

**SECOND SUPPORTING AFFIDAVIT**

I HEREBY CERTIFY UNDER PENALTY OF PERJURY THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT AND THAT I HAD PERSONAL KNOWLEDGE OF THIS BIRTH AT THE TIME OF OCCURRENCE FOR THE FOLLOWING REASON.

20A. SIGNATURE OF PERSON COMPLETING THE AFFIDAVIT ▶ | 20B. RELATIONSHIP TO PERSON WHOSE NAME IS ENTERED IN ITEM 1 | 20C. AGE OF PERSON COMPLETING THE AFFIDAVIT

20D. DATE SIGNED | 20E. ADDRESS OF PERSON COMPLETING THE AFFIDAVIT (STREET, CITY, STATE, ZIP)

**DO NOT WRITE BELOW THIS SPACE—FOR STATE REGISTRAR USE ONLY**

**SUPPORTING DOCUMENTS**

| | TYPE / BY WHOM ISSUED AND SIGNED | DATE ISSUED | DATE ORIGINAL MADE |
|---|---|---|---|
| 21A | Voter's Registration,Alameda Co.Clerk,CA | 5-13-91 | 1-21-86 |
| 21B | Social Security #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,Social Security Adm.Los Angeles,CA | 3-8-91 | 7-23-86 |
| 21C | School Record,Peralta Community College,Oakland,CA | 5-3-91 | 4-1-85 |

**EVIDENCE AS STATED IN DOCUMENTS**

| | DATE OF BIRTH OR AGE | BIRTHPLACE | NAME OF FATHER | MAIDEN NAME OF MOTHER |
|---|---|---|---|---|
| 22A | --- | California | --- | --- |
| 22B | August 28, 1963 | Richmond,California | Sampson W.Magiya | Margaret S.Hudson |
| 22C | August 28, 1963 | --- | --- | --- |

**STATE REGISTRAR**

I HEREBY CERTIFY THAT NO PRIOR CERTIFICATE HAS BEEN FOUND ON FILE IN THIS OFFICE FOR THE ABOVE REGISTRANT, THE EVIDENCE HAS BEEN REVIEWED AND SAID EVIDENCE SUBSTANTIATES THE FACTS AS SET FORTH IN THE FOREGOING ABSTRACT

23. OFFICE OF STATE REGISTRAR ▶ **OFFICE OF THE STATE REGISTRAR OF VITAL STATISTICS**

24. DATE REGISTERED **JUL 13 1991**

(Rev. 7-90) FORM VS-85

STATE OF CALIFORNIA, DEPARTMENT OF HEALTH SERVICES, OFFICE OF STATE REGISTRAR

This is to certify that this document is a true copy of the official record filed with the Office of State Registrar.

Kenneth W. Kizer, MD, MPH, Director and State Registrar of Vital Statistics

by: *David W. Mitchell*

DAVID MITCHELL, CHIEF
OFFICE OF STATE REGISTRAR

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.

DATE ISSUED **SEP 09 1991**

516674




ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

000581

EXHIBIT D



# Memorandum

A27 163 833 (I-52) —

| | |
|---|---|
| Subject   MAGIYA, Preston | Date   April 22, 1988 |
| To   INTERPOL/INS Liaison | From   DIINV/SFR |

Attached are the fingerprints of an alien known to the Service as PRESTON MAGIYA, DOB 11/05/64, place of birth unknown, but suspected to be Nigeria. He came to Service custody 4/21/88 from San Francisco PD after his conviction for cashing forged checks (575PC). Investigation has produced enough evidence to refute his claim to US Citizenship through birth in California, but our only evidence of true nationality to date is NIIS record of entry showing he came in as PRESTON HUDSON, DOB 11/5/64, using a UK passport. Search of UK passport records was negative, however.

Since our time is severely limited, it is requested that an urgent effort to identify Subject by date and place of birth and nationality be made. Known AKA's and DOB'S follow:

AMAGIYA, Preston
Hudson-Amagiya, Preston Ogheneochuko
PRESTONE, Amagiya

11-5-64;  5-11-64;  8-28-63

Thank you for your help.

Special Agent

000797

EXHIBIT E



U.S. Department of Justice

Immigration and Naturalization Service

SFR 1230/1.3 (I-52)

District Director

*Appraisers Building*
*630 Sansome Street*
*San Francisco, CA. 94111*

April 21, 1988

Ms Billee Snider
Office Services Supervisor
Department of Social Services
410 "N" Street
Sacramento, CA  95814

Dear Ms. Snider:

This Agency is conducting an investigation of Preston Magiya, believed to be a foreign national, who obtained a Delayed Registration of Birth from your Department which was based on apparently fraudulent supporting documentation. The following information identifies the Registration issued, a copy of which is attached for your reference:

|   |   |
|---|---|
| Name: | Preston Chucks Magiya |
| Date of Birth: | 08-28-63 |
| Place of Birth: | Richmond, Contra Costa |
| Mother's Name: | Margrate Susan Hudson/Magiya |
| Father's Name: | Sampson Wilson Magiya |
| State B/C Number: | 104-63-380821 |

Our investigation has developed the following information with respect to the supporting document and supporting affidavit listed on the Registration:

Supporting document, Bank record #0201-038-469, Crocker National Bank made 8-14-80, is an original signature card completed by Preston Amagiya, which was actually made 8-14-85, and on which he shows Illinois as his place of birth; a copy is attached to this letter;

Supporting affidavit by Ira Lee Berry, age 62 as of 5-23-86, Magiya's uncle living at 260-29th street, Oakland; Ira Lee Berry supplied this Agency an affidavit testifying that he is not Magiya's uncle, has no personal knowledge of Magiya's birth or his mother and never submitted such a supporting affidavit to your Department; a copy of his affidavit is attached to this letter.

In addition investigation has established through forensic fingerprint and handwriting comparison that Preston Magiya is Preston Hudson, who, according to the records of this Agency, entered the United States in 1985 with a passport issued by the United Kingdom identifying him as a citizen of the United Kingdom by birth in London.

000795

The purpose of my letter is to present the above evidence of fraudulent birth registration by Preston Magiya and to request that your department seal the record of the Delayed Registration of Birth identified above in order that this Agency can continue toward deportation proceedings against Mr. Magiya.

Sincerely,

Joseph F. Brandon, Jr.
Assistant District Director
For Investigations

Attachments

- 2 -

EXHIBIT F

# Memorandum



A 27 163 833 (I-52)

| | |
|---|---|
| Subject   MAGIYA, Preston | Date   April 29, 1988 |
| To     File | From   ⬛⬛⬛ 7C |

On 4/27/88 this office received a Certificate of No Record from the California Dept. of Health Services relating to SUBJECT'S (false) claim of birth 8/28/63 in Richmond, Ca. The certificate was issued in response to evidence filed with that office showing that their issuance of a Delayed Registration of Birth was based on fraudulent supporting documentation (See I-213 dtd 3/16/88 and addendum).

The same date, an Affidavit of Registration was obtained from the Alameda County Registrar of voters showing that SUBJECT registered to vote, claiming U.S. citizenship at that office on 1/17/86.

7C *Both documents are attached to this memo.* DPD

⬛⬛⬛
Special Agent

EXHIBIT G



U.S. Department of Justice

Immigration and Naturalization Service

SFR 1230/4    (I-52)

**District Director**

*Appraisers Building*
*630 Sansome Street*
*San Francisco, CA. 94111*

April 4, 1988

Elliott R. Kramer
Regional Inspector General for Investigations
Department of Health & Human Services
P. O. Box 42516
San Francisco, CA    49102

Dear Mr. Kramer:

This Agency is conducting an investigation of Preston Magiya, a suspected Nigerian National who is believed to have obtained at least three Social Security cards, one of them by falsely claiming U. S.Citizenship, through birth in Richmond, California. The purpose of my letter is to request certified copies of the applications for a social security number card (SS-5) submitted by him. These copies will be helpful as evidence to support a charge of 18 (USC 911 (False Claim to U.S. Citizenship) against Magiya in District Court.

The relating numbers, corresponding names and dates of birth are as follows:

| 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 | Preston Amagiya | 11-05-64 |
| 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 | Preston Amagiya | 05-11-64 |
| 572-89-997 | Preston Chucks Magiya | 08-28-63 |

It is my understanding that delivery of the SS-5's will require about 4-6 weeks; because we anticipate having Magiya in our custody before then, may we also have certified numidents relating to the SS-5's for presentation in deportation proceedings to forestall his release on a low bond?

Thank you very much for your assistance.

Sincerely,

Joseph F. Brandon, Jr.
Assistant District Director
for Investigations

esb 1
see 7/8/91

000793

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

--oOo--

| | | |
|---|---|---|
| PRESTON MAGIYA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 3:07-CV-2945 CRB |
| | ) | |
| MICHAEL B. MUKASEY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

--oOo--

FRIDAY, DECEMBER 14, 2007

10:10 A.M.

--oOo--

DEPOSITION OF

DEBBIE BALSLEY

--oOo--

Louise Hatzenbehler
Certified Shorthand Reporter
License No. 12312

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

2

```
 1                    A P P E A R A N C E S

 2

 3      For the Petitioner:

 4          VAN DER HOUT, BRIGAGLIANO & NIGHTINGALE, LLP
            By:  ZACHARY NIGHTINGALE, Attorney at Law
 5          180 Sutter Street, Fifth Floor
            San Francisco, CA  94104
 6          (415) 981-3000

 7
        For the Respondent:
 8
            U.S. DEPARTMENT OF JUSTICE
 9          OFFICE OF THE UNITED STATES ATTORNEY
            NORTHERN DISTRICT OF CALIFORNIA
10          By:  ILA C. DEISS, Assistant U.S. Attorney
            450 Golden Gate Avenue
11          Box 36055
            San Francisco, CA  94102
12          (415) 436-7124

13          Present Via Telephone:
            U.S. DEPARTMENT OF JUSTICE
14          CIVIL DIVISION, OFFICE OF IMMIGRATION LITIGATION
            By:  PATRICIA M. CORRALES, Attorney at Law
15          Office of the Chief Counsel
            300 North Los Angeles Street, Room 8108
16          Los Angeles, CA  90014
            (213) 894-8627
17

18      Also Present:

19          NANCY BARRERA, Staff Counsel, California
                 Department of Public Health
20          JANET McKEE, Chief, Office of Vital Records

21                        --oOo--

22

23

24

25
```

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

41

1        MS. DEISS:  Asked and answered.

2    Q.      BY MR. NIGHTINGALE:  Do you know -- in any of

3    the handful of examples you're aware of these requests

4    to seal -- whether your office made any attempts to

5    contact the registrant before making the determination

6    of whether to seal or not?  When I say "your office," I

7    mean the office of the chief registrar.

8    A.      Not that I'm aware of.

9    Q.      Are you aware of any policy that would ever

10   call for the contacting of the registrant to respond to

11   the proffered information in their request to seal?

12   A.      I don't know the answer to that.

13   Q.      Okay.  In your review of Preston Magiya's 1986

14   birth certificate that was subsequently sealed, do you

15   know whether the registrar's office undertook any

16   investigation of its own separate from the documents

17   that were provided in their request to seal from INS?

18   A.      I don't know that.

19   Q.      In your review of the file, did it appear that

20   that was the case, that there was any separate

21   investigation?

22   A.      It doesn't appear that they made a separate

23   investigation.

24   Q.      Does it appear from your review of the file

25   that the Office of Vital Records asked any of the INS

42

1    investigators or other individuals who made the

2    complaint to sign under penalty of perjury regarding the

3    evidence that they proffered?

4            MS. DEISS:  Objection; assumes facts not in

5    evidence.  We haven't talked about a complaint.

6            MR. NIGHTINGALE:  Okay.

7    Q.      Your declaration refers to a letter issued by

8    INS in 1988 to the Office of Vital Records regarding the

9    1986 birth certificate of Preston Magiya.  Are you

10   familiar with what I'm referring to?

11   A.      Yeah, I'm familiar with that.

12   Q.      Okay.  And it appears from your declaration

13   that in response to that letter and the documents

14   attached to it, that the 1986 birth certificate was in

15   fact sealed; is that right?

16   A.      Yes, it was.

17   Q.      Okay.  So in your review of the file regarding

18   that matter, does it appear that the Office of Vital

19   Records requested of INS in any way a signed affidavit

20   along the lines that you described would happen in the

21   current procedure for the amendments?

22   A.      It doesn't appear that they requested that, but

23   I'm not privy to that information.

24   Q.      If they had, would it have been in the file of

25   the documents that you reviewed?

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

43

1    A.        I'm sure they would have kept any of the

2    documentation.

3    Q.        And you didn't see --

4    A.        I did not see anything.

5    Q.        Okay.  Do you have any basis to think that the

6    decision by the Office of Vital Records to seal the 1986

7    birth certificate in response to a request by INS was

8    made based on any evidence besides the documents that

9    INS provided?

10   A.        Clarify that, please.

11   Q.        Okay.  INS sent a letter, what you just

12   referred to was supporting documents?

13   A.        Yes.

14   Q.        Is there any basis to think, in your review of

15   the record, that the Office of Vital Records considered

16   anything else besides that packet of information in

17   making the decision to seal?

18   A.        I don't know the answer to that.

19   Q.        Okay.  But in your review of the file, is there

20   any evidence of that?

21   A.        There doesn't seem to be evidence that they did

22   an independent investigation.

23   Q.        Would that logically lead you to conclude that

24   the decision to seal the 1986 birth certificate was

25   based on that packet of information --

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

44

```
 1              MS. DEISS:  Objection; lacks foundation.

 2              MR. NIGHTINGALE:  I'm going to ask you to

 3     answer.

 4              MS. DEISS:  Objection; confusing.

 5              MR. NIGHTINGALE:  Okay.

 6     Q.      All right.  Let me take a step back.  How did

 7     you obtain -- did you review the 1988 letter from INS to

 8     the Office of Vital Records that you refer to in your

 9     declaration?

10     A.      Yes.

11     Q.      And how did you obtain a copy of that?

12     A.      That was a copy we had on file.

13     Q.      In the same file?

14     A.      In our file, yes.

15     Q.      Okay.  And was the supporting documentation

16     that Immigration provided along with that also in the

17     file?

18     A.      Yes, it was.

19     Q.      And was any other documentation in the file?

20     A.      Besides what's provided here, no.

21     Q.      Okay.  If other information had been consulted

22     at the time that the Office of Vital Records decided to

23     seal, would that under the normal course of business be

24     kept in the file along with the other documents that you

25     found there?
```

45

1    A.        Yeah.   We would keep records of everything that

2    was provided to us.

3    Q.        Do you know who in the Office of Vital Records

4    made the decision to seal in response to that request

5    from INS?

6    A.        That would have been the chief registrar for

7    the Office of Vital Records.

8    Q.        Do you know who that was?

9    A.        At the time it was David Mitchell.

10   Q.        Does David Mitchell still work at the Office of

11   Vital Records to your knowledge?

12   A.        No.  He's retired.

13   Q.        Do you know when he retired?

14   A.        I'm not quite aware.

15   Q.        Did you know him personally in the course of

16   your work here?

17   A.        Yes, I did.  I worked for him.

18   Q.        When was that?

19   A.        I worked for Mr. Mitchell from 1979 till I left

20   in 1986 or 1987.  When I came back, there was a new

21   chief registrar, and I came back in 1995.

22   Q.        What was your position during that time period?

23   A.        Which one?

24   Q.        That you just referred to, 1979 to 1986?

25   A.        I was a word processing technician.

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

46

1    Q.        In what department?

2    A.        I worked for the Amended Records unit.  I'm

3    sorry.  It wasn't the Amended Records unit.  I worked

4    for Customer Service unit, but I was the word processing

5    technician for the Amended Records unit.  We were short

6    on staff.

7    Q.        Can you tell in your review of the file whether

8    Mr. Magiya was ever contacted in the course of the

9    registrar's investigation prompted by the INS letter?

10   A.        We don't have a letter in here to him.

11   Q.        Would that lead you to conclude that he was not

12   contacted?

13   A.        No documentary evidence.  I don't see we sent a

14   letter out to him.  So I can't make an assumption that

15   he wasn't contacted by phone.  I can only assume that we

16   didn't keep any documentary evidence that he was

17   contacted.

18   Q.        When the sealing was granted in response to the

19   INS request, is there any evidence that your office made

20   any attempt to contact Mr. Magiya to inform him of that?

21            MS. DEISS:  Asked and answered.

22            MR. NIGHTINGALE:  I don't think so, but that's

23   okay.

24   Q.        Do you know approximately how many delayed

25   birth certificates your office issues a year?

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

53

1    Q.       BY MR. NIGHTINGALE:  And I'd like to refer to

2    page 7, please, paragraph 13.  Do you have that in front

3    of you?

4    A.       Yes, I do.

5    Q.       In the first sentence you refer to a letter,

6    and the end of that sentence reads:

7                       "...dated April 21, 1988, providing

8                       facts establishing the true identity

9                       and birthplace of Preston Chucks

10                      Magiya."

11   A.       Yes.

12   Q.       What is your basis for using the phrase "true

13   identity"?  What were you referring to?

14   A.       True identity was the fact that Mr. Magiya had

15   indicated he was born in the state of California and he

16   was not.

17   Q.       When you say "he was not," was that based on

18   the documents that INS provided which you found in the

19   file?

20   A.       I would assume that's why they administratively

21   sealed this.  It was not what was -- yeah, what was in

22   file here, which is the record from his uncle stating

23   that he was not his uncle and did not know him and as

24   well as the bank record.

25   Q.       Okay.  Do you know how either the statement of

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

54

```
 1    Ira Lee Berry or the bank record established the true

 2    identity of Preston Chucks Magiya?

 3    A.        Please repeat that.

 4    Q.        Do you know how either of the two documents you

 5    just referred to -- the affidavit of Ira Lee Berry that

 6    Immigration provided or the bank record that Immigration

 7    provided -- do you know how either of those documents

 8    indicated established the true identity of Preston

 9    Magiya?

10    A.        I don't know if it really established who

11    Mr. Magiya actually was.

12    Q.        Okay.  So my question then is where did that

13    phrase "providing facts establishing the true identity

14    of Preston Magiya" come from?  On what basis was that

15    statement made?

16    A.        All right.  I think that was in terms of

17    Mr. Magiya supplying a record under one name in 1986,

18    under a different name in 1991.  And the bank record

19    that he supplied, the last name was different, plus his

20    place of birth was listed as Illinois.

21    Q.        So --

22    A.        I think the true identity about his place of

23    birth was done through the forensic fingerprints.

24    According to the letter in here, is how they established

25    his true identity, and that was done through the U.S.
```

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

55

1    Department of Justice.

2    Q.       Do you know what true identity it purported to

3    establish?

4    A.       I think what they are -- I think this referred

5    to the true identity of Mr. Magiya of who he legally was

6    and where he was legally born.

7    Q.       Did Immigration ever present to you evidence of

8    who he legally was or where he was legally born?

9            MS. DEISS:  Objection; lacks foundation.  They

10   never presented her evidence of anything.

11           MR. NIGHTINGALE:  That's my question.

12   Q.       When I said "you," I'm referring to the office

13   whose files you reviewed.

14   A.       Not in what I have here.

15   Q.       Okay.  So the last sentence of that paragraph

16   reads:

17                   "The INS also informed OVR that it

18                   had determined Mr. Magiya's true

19                   identity and place of birth through

20                   forensic fingerprints and handwriting

21                   comparison."

22           Based on your review of the file, did

23   Immigration ever inform OVR of that true identity or

24   place of birth?

25   A.       I couldn't answer that.  It's not provided as

56

1    written documentation that's in this file, so I couldn't

2    answer that truthfully.

3    Q.      You could state that it's not contained in the

4    documents you reviewed in the file?

5    A.      If he had a different name and so forth, no, it

6    wasn't provided.  It's not provided in the documents

7    that I have, so I don't know what his real name is.

8    Q.      So that sentence, if I understand correctly,

9    means that the INS informed OVR it had determined --

10   they merely asserted they had made that determination

11   without providing the details?  Is that an accurate

12   summary of your review of the file?

13   A.      I couldn't -- again, I couldn't say this

14   because I don't know if we've -- what all was presented.

15   Q.      If more documents had been presented by INS?

16   A.      I do believe they would have been part of this

17   record.

18   Q.      Right.  So, obviously, if for some reason they

19   weren't, none of us are able to ascertain that based on

20   the record that we have; right?

21   A.      That's true.

22   Q.      Okay.  Your declaration refers to a Crocker

23   National Bank record.  Does the file reveal that that

24   document was presented by Immigration to OVR?

25   A.      Yes.

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

57

1    Q.        And is that still in the file now?

2    A.        Yes.

3    Q.        A copy anyways?

4    A.        Yes, it is.

5    Q.        Does the file indicate based on your review

6    whether OVR took any independent -- I'm sorry --

7    performed any independent investigation regarding

8    contacting Crocker National Bank or otherwise tried to

9    verify that document?

10   A.        It's not listed in this documentation if that

11   was done.

12   Q.        Okay.  And, again, is it likely if such an

13   investigation had been done by OVR, it would be listed

14   in the file under the normal course of business?

15   A.        Yes.

16   Q.        Regarding the statement from Ira Lee Berry, is

17   a copy of that still in the file?

18   A.        Yes, it is.

19   Q.        And is there anything in the file to suggest

20   that OVR made any attempts to contact Ira Lee Berry or

21   otherwise confirm the contents of his affidavit?

22   A.        It's not contained in this.

23   Q.        And, again, if OVR had done so, it likely would

24   be contained in the file?

25   A.        It likely would be in here.

58

1    Q.      You referred to the government's reference --

2    sorry.  Page 7 of your declaration, at the end of

3    paragraph 13, again you refer to forensic fingerprints

4    and handwriting comparison as some of the documents that

5    INS referred to.  Does the file reveal that Immigration

6    ever provided to your office those forensic fingerprints

7    or handwriting comparison?

8    A.      It doesn't appear to be.

9    Q.      Does not appear to be, did you say?

10   A.      Does not appear to be.

11   Q.      Okay.  So does it appear that Immigration

12   phoned your office in a summary fashion that it had done

13   that investigation without providing the details?  Is

14   that an accurate understanding of what's in the file

15   today?

16           MS. DEISS:  Objection; lacks foundation.

17   Q.      BY MR. NIGHTINGALE:  In your review of the

18   file, when you say the sentence:

19              "The INS also informed OVR that it

20              had determined Mr. Magiya's true

21              identity and place of birth through

22              forensic fingerprints and handwriting

23              comparison."

24           In what manner did INS inform OVR of that, if

25   you know?

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

59

1   A.        I don't know.

2   Q.        Is it contained in the file anywhere?

3   A.        It's not contained in the file.  The last

4   paragraph in the letter that was provided to us stated

5   that they had established this forensic fingerprint and

6   handwriting comparison, that this had already been

7   established by Immigration.

8   Q.        And, again, there's no evidence in the file now

9   that OVR took any independent investigation of those

10  allegations; is that accurate?

11  A.        Not that I'm aware of.

12  Q.        Okay.

13            MS. CORRALES:  Zach, is this a good time to

14  take a break?  We've been going for about an hour and

15  forty-five minutes.

16            MR. NIGHTINGALE:  That's fine with me.  Do you

17  want to take a ten-minute break?

18            MS. CORRALES:  Do you have more?

19            MR. NIGHTINGALE:  I don't have much more, but

20  I'm happy to take a ten-minute break.

21            MS. CORRALES:  Okay.  That would be great.

22            (Break taken in proceedings.)

23  Q.        BY MR. NIGHTINGALE:  I want to again refer to

24  page 7, please, paragraph 13.  In the middle of that

25  paragraph is the sentence:

60

```
 1                    "The INS informed OVR that INS

 2                    determined that the bank record

 3                    submitted for Crocker National Bank

 4                    had been altered in the year

 5                    established..."

 6           On what basis -- sorry.  Does the file that you

 7   reviewed have any indication of an alteration in the

 8   Crocker National Bank document, or how did --

 9   A.       Like did they annotate that they had been

10   altered?

11   Q.       Well, where did that information come from, if

12   you know from review of the file?

13   A.       According to the letter, the INS was the one

14   who informed us that the bank record that had been

15   submitted was altered.

16   Q.       So, again, this was a determination INS made

17   and informed you about but didn't provide any specific

18   evidence thereof?

19   A.       They supplied us a copy of the bank record

20   again.

21   Q.       Did the copy of the bank record they supplied

22   indicate any alteration?

23   A.       Not that I'm aware of.

24   Q.       Okay.  So they provided a copy of a bank record

25   that they stated had been altered; is that right?
```

61

1    A.        That's right.

2    Q.        Without indicating the nature or the alteration

3    or what their basis for believing it was altered?

4    A.        Well, they based it on the year established.

5    Mr. Magiya would have had to submit us a document that

6    had been established five years prior to him submitting

7    for the delayed registration of birth.  So the bank

8    records show that he established this in 1980, and

9    according to INS, they determined that he had altered

10   that copy before they submitted it to our office.

11   Q.        Okay.  So what is your basis for believing that

12   the document Mr. Magiya submitted purported to be from

13   1980?  Where does that information come from?

14   A.        From the INS determination.

15   Q.        No.  If I understood you, you said when

16   Mr. Magiya first established his -- first applied for

17   his delayed registration of birth, he attached a

18   document purporting to be from 1980.  Is that what I

19   understood you to say?

20   A.        Yes.  And that's indicated on the document

21   itself that the date the original was made or

22   established was August 14 of 1980.

23   Q.        Okay.  When you're referring to the document,

24   are you referring to the Crocker Bank document or to the

25   delayed registration of birth document?  Which document

62

1    refers to 1980?

2    A.      Right here what we've got listed on here.

3    Q.      "On here" is which document are you referring

4    to?

5    A.      It's the delayed registration of birth.  Staff

6    will -- once we accept the document as valid for

7    registering, then we would type the information here.

8    And staff typed on August 14, 1980, because that would

9    be the record -- that would be the date that would be on

10   the bank record that Mr. Magiya supplied to us at the

11   time.

12           MS. DEISS:  For clarification, can we say that

13   the delayed birth certificate registration of --

14           THE WITNESS:  June 23.

15           MS. DEISS:  Let me finish so I can get this on

16   the record -- that the delayed registration of birth

17   that we're referring to is the June 23, 1986, delayed

18   registration.

19           MR. NIGHTINGALE:  Thank you.

20   Q.      So the typewritten reference to the Crocker

21   National Bank document was not made by the registrant

22   but made by your office in the course of adjudicating?

23   A.      Yes, it was.

24   Q.      Okay.  And do you have a copy of the bank

25   record that Mr. Magiya would have attached to the

63

1    initial application?

2    A.        Yes, I do.

3    Q.        And does it have a date on it?

4    A.        Yeah.  This record says August 14, 1985.

5    Q.        Do you have a copy of a document purporting to

6    be from 1980?

7    A.        No.  We don't have the one that was originally

8    submitted because at that time we did not keep the

9    supporting documentation.

10   Q.        What did you do with it?  At the time what was

11   the policy to do with it?

12   A.        Well, the policy was the file would be

13   archived, and it was usually kept for -- I do believe

14   five years.  And then at that time they're shredded

15   under confidential shred laws.

16   Q.        So the OVR no longer has a copy of the original

17   supporting documentation?

18   A.        Not of the one that we used to establish this.

19   Q.        So the one in the file was the one presumably

20   provided by INS at the time of their investigation?

21   A.        According to this, INS provided what was on

22   file with Crocker National Bank.  What was provided to

23   us was an altered -- I'm assuming an altered record

24   because of the date that was typed by the person that

25   registered this.

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

64

1    Q.      Is there any way to know whether the original

2    document that was the basis of the person typing in

3    1980 -- whether that was the same document as the one

4    Immigration later provided that had the date of 1985?

5    A.      I would have no idea.

6    Q.      Okay.  So to the extent that OVR thought it was

7    the same document, that appears to be based on the

8    statements by INS that it was the same document, because

9    OVR didn't have a copy of that any longer to compare

10   itself?  Is that accurate?

11   A.      I would assume that's accurate.

12   Q.      Okay.  I don't think I asked this question, so

13   I'm not trying to repeat myself, just to clarify.  On

14   the statement by Ira Lee Berry that was referred to --

15   the supporting affidavit of Ira Lee Berry that

16   Immigration provided to OVR, is a copy of that still in

17   the file?

18   A.      Yes.

19   Q.      And did OVR take any steps -- can you determine

20   from reviewing the file whether OVR took any steps to

21   determine if the signatory on that affidavit was the

22   same person who signed the original delayed registration

23   of birth?

24   A.      Not that I'm aware of.

25   Q.      Okay.  So does it appear that OVR again simply

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

65

1   accepted INS's proffered statement that it was the same

2   individual?

3   A.      I couldn't make that determination.

4   Q.      Okay.  I want to refer now to the second

5   delayed birth certificate for 1991, please.  On page 9

6   of your declaration, marked as Exhibit 1, you refer to

7   the reason that OVR didn't recognize it to have come

8   from the same individual.  We're referring to your

9   manual search.  What was it about the manual search that

10  made it not possible to identify it being the same

11  individual?

12  A.      When a delayed registration of birth comes in,

13  they will search the regular birth indices to make sure

14  that there is not already a certificate of live birth

15  established.  From that point they will also search the

16  delayed registration of birth index cards that were

17  typed up.  In this particular case matching information

18  would be the registrant's name, date of birth, and

19  mother's maiden name.

20  Q.      So the fact that the name and date of birth

21  were the same would not have made it possible to

22  identify the...?

23  A.      I'm not sure why that was missed.  The

24  difference I could see would be that the middle name was

25  "O" instead of "C."  And the mother's name in this

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

66

1    particular case was listed as Margaret Omene, and on the

2    original filed in 1963, it was Margrate -- I do believe

3    Hudson was listed as the maiden name on that one.

4          The place of birth was the same, but on the

5    1986, he didn't list an address.  On the one of 1991, he

6    did list an address where he was born, the assumption

7    being he was born at home.  So it was a street address,

8    not a hospital facility name.

9    Q.     Okay.  And in the determination to seal the

10   second delayed birth certificate, does the file indicate

11   that there was any different information provided by INS

12   to the registrar for him to make that determination from

13   what was previously provided in the determination to

14   seal the first time, or was it the same information

15   provided?

16   A.     I really couldn't make that determination.

17   There is one letter from INS and -- I couldn't tell you.

18   There's no other documentation in here that they

19   provided us any other documents on this.

20   Q.     Okay.  So based on that fact, would it seem to

21   be a pretty safe assumption to understand the file to

22   show when Immigration pointed out to OVR this was the

23   same individual that was previously sealed?

24          MS. DEISS:  Objection; lacks foundation.

25          MR. NIGHTINGALE:  All right.  I'll rephrase it.

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

67

1   Q.       Did Immigration provide any -- in contacting

2   OVR regarding the 1991 delayed birth certificate and

3   asking you to seal it, did Immigration provide any

4   different information other than the fact that they

5   believed it was the same person who had asked for a

6   delayed birth certificate in 1986 that was then sealed

7   and that brought to your attention it was the same

8   individual?

9           MS. DEISS:  Objection; lacks foundation.  She

10  wasn't present at the time.

11  Q.       BY MR. NIGHTINGALE:  Based on your review of

12  the file?

13  A.       Based on my review of the file, they let us

14  know that we reestablished the record.

15  Q.       By issuing a second delayed birth certificate?

16  Is that what you mean?

17  A.       I would assume.

18  Q.       Does the file indicate any investigation having

19  been undertaken by OVR in 1991 in response to

20  Immigration's letter?

21  A.       I wouldn't be aware of that.

22  Q.       Since that communication from Immigration in

23  1991, before this case came up, is there any evidence

24  that OVR received any other communications about Preston

25  Magiya's birth certificates?

68

1    A.        Not that I'm aware of.

2    Q.        On page 9 of your declaration, paragraph 17,

3    the final sentence, this was referring to the second

4    certificate was sealed:

5                    "The certificate was sealed on

6                    December 21, 1991, pursuant to

7                    information received from INS that

8                    it, too, was fraudulently filed."

9          Did OVR undertake any independent determination

10   regarding fraud from your review of the file, or is this

11   simply a summary based on the information provided by

12   INS?

13   A.        I couldn't provide you an answer to that

14   because I'm not aware of the facts.

15   Q.        Okay.  Is there any indication in the file that

16   a separate investigation determining fraud was

17   undertaken by OVR?

18   A.        Nothing in the file.

19   Q.        Okay.  Is there anything in the file -- strike

20   that.

21          If a government agency makes a request to OVR

22   to check if a birth certificate exists and then the

23   office checks and responds to that, is any record of

24   that investigation and response kept?

25   A.        If it's done formally, we would keep something

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

69

1   on file.  But we do phone contacts from agencies all the

2   time verifying if we have a record on file, and no, we

3   wouldn't keep records of that.

4   Q.        When you say you do phone -- response to phone

5   inquiries, if the response is negative to a phone

6   inquiry, do you keep a record of that?

7   A.        You mean if they're calling and saying, "Do you

8   have this record on file," and we say, "I don't find a

9   listing under the information you provided," no.  Unless

10  they were to ask for something in writing, we don't do

11  that arbitrarily.  Usually if we don't take a phone call

12  request, it's usually we need to know that you're from

13  the agency you state you are, and there is a fee

14  involved for us searching and providing that

15  information.

16  Q.        Is there a fee even on a phone inquiry?

17  A.        We usually tell people that, yeah, they would

18  need to -- if they want an actual valid documentation of

19  the search, we tell them that there would be a fee

20  required for that.

21  Q.        Is there any record in Mr. Magiya's file that

22  Immigration contacted OVR in February of 1988 to ask for

23  a search of the records?

24  A.        Not that I can see in the file.  The first

25  letter of inquiry I have here is from April 21, 1988.

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

70

1   Q.      April 21, did you say?

2   A.      Yeah, was the written documentation that was

3   provided to us by Immigration.

4   Q.      Okay.  Is there an office -- excuse me.

5           Is there a Department of Vital Statistics which

6   is separate from what is now OVR?

7   A.      We were known as the Department of Vital

8   Statistics or Office of Vital Statistics prior to being

9   known as the Office of Vital Records.

10  Q.      So it's the same office?

11  A.      We're one and the same.

12  Q.      And in 1988 it was Vital Statistics?

13  A.      Yes, we were Vital Statistics.

14  Q.      Okay.  And you have no record of a February 10,

15  1988, request for a certification of nonexistence of

16  record regarding Mr. Magiya -- or anytime in the month

17  of February of 1988?

18  A.      Nothing that we have in writing.  To clarify

19  that, they used to -- Immigration and Naturalization and

20  Border Patrol would call us.  They had a contract with

21  us, and we would do phone verifications -- yes, we had

22  this record, or no, we didn't.  And they would take our

23  response as a valid response as opposed to having to be

24  provided a certificate of no public record or to be

25  provided as certified copy of the record.  So it was

PETERS SHORTHAND REPORTING CORPORATION   (916) 362-2345

76

```
 1                REPORTER'S CERTIFICATE

 2         I, LOUISE HATZENBEHLER, a Certified Shorthand

 3    Reporter in and for the State of California, duly

 4    commissioned and sworn to administer oaths, do hereby

 5    certify that the witness in the foregoing deposition,

 6                    DEBBIE BALSLEY,

 7    was by me duly sworn to testify to the truth, the whole

 8    truth, and nothing but the truth in the within-entitled

 9    cause; that said deposition was taken at the time and

10    place hereinbefore set forth; that the testimony of said

11    witness was reported by me, a duly qualified Certified

12    Shorthand Reporter and a disinterested person, and by me

13    thereafter transcribed into typewriting.

14         I further certify that upon completion of the

15    deposition, review of the transcript was requested.  Any

16    changes made by the deponent and provided to the

17    reporter during the period allowed are appended hereto.

18         IN WITNESS WHEREOF, I have hereunto set my hand

19    this 21st day of December, 2007.

20

21

          LOUISE HATZENBEHLER, CSR No. 12312

22        Certified Shorthand Reporter

          in and for the County of Sacramento,

23        State of California

24

25
```